In re: ) Case No. 13-11201
)
CHRISTOS S. DIAMANTIS, ) Chapter 7
)
      Debtor. ) Chief Judge Pat E. Morgenstern-Clarren
)
) **MEMORANDUM OF OPINION**
) **AND ORDER**

      Within 90 days before the debtor Christos Diamantis filed his chapter 7 case, he transferred about $38,000.00 to his employer Ford Motor Company to repay disability benefits. The chapter 7 trustee demanded that Ford return the funds as a preference; in response, Ford paid $24,000.00 to resolve the issue.

      The debtor seeks to exempt that recovered money under Bankruptcy Code § 522(g)(1), which applies only if the debtor did not transfer the funds voluntarily. The trustee objects that the debtor voluntarily transferred the funds because he signed documents permitting Ford to take the funds as they became available. The debtor argues that, in the employment context, this was not a voluntary transfer because he was required to be a member of the union that negotiated the contract that in turn required him to sign the papers as a condition to getting benefits from Ford. And that if he had not signed, he would not have received the benefits and would likely have been terminated. For the reasons stated below, the trustee's objection is sustained.[1]

---

[1] Docket 28, 39, 40, 68, 70, 73, 78.

# JURISDICTION

Jurisdiction over this proceeding exists under 28 U.S.C. § 1334 and General Order No. 2012-7 entered by the United States District Court for the Northern District of Ohio on April 4, 2012. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), and it is within the court's constitutional authority as analyzed by the United States Supreme Court in *Stern v. Marshall*, 131 S.Ct. 2594 (2011).

# THE TRIAL

The trustee presented his case through stipulations, exhibits, and the cross-examination of the debtor and Robert Rebecca, former coordinator of benefits for the UAW-Ford. The debtor presented his case through stipulations, exhibits, his own testimony, and the testimony of Mr. Rebecca.

# FACTS[2]

### A. The Collective Bargaining Agreement

Many years ago, the debtor joined the United Auto Workers union as a condition of his employment at Ford Motor Company. The employment terms of all hourly workers at the plant are governed by collective bargaining agreements (CBA) between the UAW and Ford. The CBA provision that is relevant here is a change to the disability benefits program, negotiated in 2007 and put into effect in 2008.

Robert Rebecca, a former assistant director of benefits for the UAW, participated in the negotiations that led up to the 2007 CBA. He testified at trial that both parties brought issues to

---

[2] The stipulations are more detailed than this recitation of the facts, but they are consistent with it. Docket 67, 89.

the bargaining table. One such issue raised by Ford related to the interplay between disability benefits paid by Ford and those paid under the Federal Social Security Act. If Ford paid certain benefits and the employee was later approved for Social Security disability insurance (SSDI) benefits for the same period of time, Ford had the right under the then-existing CBA to recoup overpayments. What Ford did not have was an effective mechanism to monitor which employees received SSDI payments and when they received them; and so by the time Ford learned of an overpayment, it was often too late to recoup the money. Ford lost millions of dollars every year because of this problem.

Ultimately, Ford and the UAW arrived at a contract provision that Mr. Rebecca described as a "win-win." This is the agreed-upon procedure: when an employee goes out on disability leave with benefits paid by Ford, Ford asks the employee to sign documents acknowledging that the employee will repay any overpayment resulting from an overlap between benefits paid by Ford and SSDI benefits. Also, the employee acknowledges that Ford has the right to recover any overpayment through an electronic sweep of the employee's named bank account. The CBA requires the employee to sign these documents as a condition to receiving Ford benefits.

Not every worker who receives disability payments from Ford is a good candidate for receiving SSDI. Recognizing this, the parties to the CBA agreed that Ford will review the facts of each case to see if it thinks the employee has a good chance of having a SSDI benefit application approved. If so, Ford advises the employee that he or she is expected to file such an application within a certain number of days. Ford also tells the UAW Legal Services, which–through a Social Security Advocate–will then be available to represent the employee in

3

the effort to get those benefits. If the Social Security administration approves the application and pays benefits, the UAW Legal Services automatically sweeps the debtor's account to recoup any overpayment.

In conducting these negotiations, Mr. Rebecca and the rest of the negotiating team represented the interests of all of the union members.

### B. The Debtor Receives Benefits

In November 2010, the debtor consulted a doctor about unidentified injuries. The doctor wrote a note containing work restrictions, which the debtor gave to Ford. When the debtor returned to work that month, he was called to a medical appointment and told that Ford did not have any work available that met those restrictions. Ford sent him home with a packet of information and documents about disability benefits.

The debtor understood that to receive benefits, he had to fill out certain documents and send them to the company administering the benefit program for Ford. He reviewed, understood, signed, and sent two documents: Notice of Application for Hourly Disability Benefits and Pre-Authorization Withdrawal Form.[3]

The Notice of Application stated in part:

> This notice confirms that I have applied for disability benefits under the Ford Motor Company disability plan[.]
> **Agreement to Repay Overpayments**
> I understand and agree that if any benefits are paid to me that should not have been paid under the terms and conditions of the Group Policy, or should have been paid in a lesser amount (including payments that should have been in a lesser amount due to presumed or approved Social Security Disability Insurance. . .), I will repay such overpayments within 30 days of notice of

---

[3] He signed them as Christopher Deamon, the name he used at that time.

> overpayment. Any and all such payments may be recovered in the manner provided for in such Group Policy and in the Group Insurance Program applicable to me[.] . . .

The Pre-Authorization Withdrawal Form stated in part:

> I agree to the following terms regarding any award I may receive from the Social Security Administration (SSA) pursuant to my application for Disability benefits and which I will authorize SSA to deposit into the account listed below. I authorize UAW-Ford Legal Services Plan (the Plan):
>
> To withdraw from the below referenced account an amount not to exceed the amount needed to satisfy my obligation to Ford, pursuant to the Reimbursement Agreement that I previously signed with Ford[.]

The debtor could have consulted with a UAW Legal Services attorney before signing these, but he did not feel the need to do so. He was accustomed to following his employer's instructions and knew that if he did not sign the papers he would not receive any disability payments from Ford. If the debtor did not go out on disability leave and yet could not work, he anticipated that he would soon be fired for being absent from work without permission. He was not shamed, intimidated, tricked, or threatened into signing the documents.

Ford reviewed the debtor's situation and advised him to file an application for SSDI benefits, which he did. Ultimately, with the help of a UAW Legal Services attorney, the Social Security administration approved the application and paid $42,071.00 into the debtor's account. This payment created an actual overpayment of benefits by Ford in the amount of $38,570.28. Within a few weeks, the UAW Legal Services withdrew these funds from the debtor's account and paid them to Ford.

The debtor filed this bankruptcy case within 90 days after the transfer to Ford. As a result, the trustee made a demand on Ford to repay the $38,570.28 as a preference under 11

U.S.C. § 547(b).[4]  After Ford paid $24,000.00 to the trustee to settle the claim without litigation, the debtor amended his schedules to claim those funds as exempt under § 522(g)(1). The recovered funds are the only assets in the estate. The debtor remains an employee of Ford and a member of the UAW.

## DISCUSSION

### A.  11 U.S.C. § 522(g)(1)

Bankruptcy Code § 522(g)(1) gives a debtor exemption rights as to property which the trustee has recovered using her avoidance powers:

> . . . the debtor may exempt . . . property that the trustee recovers under section . . . 550 . . . of this title, to the extent that the debtor could have exempted such property. . . if such property had not been transferred, if–
>
> (1)(A) such transfer was not a voluntary transfer of such property by the debtor; and
>
> (B) the debtor did not conceal such property[.]

11 U.S.C. § 522(g)(1).

The Bankruptcy Rules state that the party objecting to a debtor's exemption claim has the burden of proving that the exemption is not properly claimed. FED. R. BANKR. P. 4003(c). At least one court has stated that the trustee bears the burden of proof on an objection to exemption under § 522(g)(1), including whether the transfer was voluntary. *See Hitt v. Glass (In re Glass)*, 164 B.R. 759, 765 (B.AP. 9th Cir. 1994), *aff'd* 60 F.3d 565 (9th Cir. 1995) (noting that a trustee "must present sufficient facts upon which a bankruptcy court could reasonably conclude that . . .

---

[4] This section provides, broadly speaking, that a trustee may recover a transfer of the debtor's property to a creditor on an antecedent debt made within 90 days of the bankruptcy filing.

6

the transfer was voluntary"). However, a number of bankruptcy court opinions state that the debtor bears the burden of proving that a transfer was not voluntary on a trustee's objection to a § 522(g) exemption. *See In re Sumner*, Case. No. 05-14243, 2007 WL 7144357 at *3 (Bankr. N.D. Ga. Nov. 26, 2007); *Hunter v. Snyder (In re Snyder)*, 108 B.R. 150, 152 (Bankr. N.D. Ohio 1989); *In re Trevino*, 96 B.R. 608, 613 (Bankr. E.D. N.C. 1989). This court concludes that the trustee has the burden of making a prima facie case that the transfer was voluntary, at which point the burden shifts to the debtor to show that the transfer was involuntary. The ultimate burden of proof remains with the trustee.

The trustee in this case recovered funds using her avoidance powers.[5] Under § 522(g)(1), "[t]he debtor's right to exempt property the trustee recovers is subject to two (2) conditions, that: (1) the transfer of property was involuntary; and (2) the debtor did not conceal the property involved." *Funches v. Household Fin. Consumer Disc. Co.(In re Funches)*, 381 B.R. 471, 491-92 (Bankr. E.D. Pa. 2008) (emphasis deleted). The contested issue here is whether the recovered transfer was a voluntary transfer by the debtor.

The term "voluntary" is not defined by the Bankruptcy Code. The governing principle, then, is that it must be read in a manner that is consistent with its plain meaning unless the literal application of the provision will produce a result demonstrably at odds with the intentions of its drafters. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). As one court noted, "the purpose behind § 522(g) . . . was to allow an exemption 'where a property interest has been *involuntarily* taken from a debtor by means such as execution, repossession or certification of a

---

[5] The trustee "need not initiate [a] formal adversary proceeding[ ] to recover property under § 522(g), so long as the trustee has taken some action resulting in the reconveyance of the property to the estate." *Russell v. Kuhnel (In re Kuhnel)*, 495 F.3d 1177, 1181 (10th Cir. 2007).

7

judgment, [because] it would be inequitable not to permit a debtor to assert an otherwise allowable exemption . . . .'" *Glass v. Hitt (In re Glass)*, 60 F.3d 565, (9th Cir. 1995) (quoting *In re Savage*, 92 B.R. 259, 261 (Bankr. S.D. Ohio 1988)). The legislative history does not shed much light on what the drafters intended when they used the term "voluntary," stating merely that the fixing of a judicial lien is an example of an involuntary transfer. *See* H.R. Rep. 595, 95th Cong., 1st Sess. 362 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6318.

The Sixth Circuit has provided guidance regarding the meaning of the term "voluntary" as it is used in § 522(g) and referenced in § 522(h)[6] –

> While the Code does not define this term, the bankruptcy courts "have generally concluded, . . . that an involuntary transfer 'occurs when . . . property is transferred by operation of law, such as by means of an execution of judgment, repossession, or garnishment.'" *Funches v. Household Fin. Consumer Discount Co. (In re Funches)*, 381 B.R. 471, 493 (Bankr. E.D. Pa. 2008) (quoting *Berman v. Forti*, 232 B.R. 653, 656 (D. Md. 1999)); *see also In re Dipalma*, 24 B.R. 385, 387 (Bankr. D. Mass. 1982) (noting that a transfer created "by operation of law" is involuntary). Here, the judgment was not a consent judgment, but a default judgment. Accordingly, the state-court conversion of Dickson's manufactured home to an improvement to real property was involuntary because it was accomplished by operation of law without consent.

*Dickson v. Countrywide Home Loans (In re Dickson)*, 655 F.3d 585, 593 (6th Cir. 2011).

Following this reasoning, a transfer is involuntary if it occurs by operation of law without consent. *See, for example, Maus v. Joint Twp. Dist. Mem'l Hosp. (In re Maus)*, 282 B.R. 836,

---

[6] Under 11 U.S.C. § 522(h), a debtor may avoid certain avoidable transfers if the trustee does not attempt to do so and the debtor could have exempted the property under § 522(g) had the trustee avoided the transfer. This makes the debtor's ability to invoke the avoidance powers subject to the limitation that a transfer must have been involuntary.

8

838 (Bankr. N.D. Ohio 2002) (stating that "it is clear that the nature of the garnishment action undertaken against the Debtor qualifies, for purposes of § 522(g), as an involuntary transfer of property"). On the other hand, a transfer is generally viewed as voluntary where the debtor consents to the transfer. *See, for example, Trentman v. Meritech Mortg. Servs. (In re Trentman)*, 278 B.R. 133, 135 (Bankr. N.D. Ohio 2002) (stating that the grant of a security interest is generally considered to be voluntary because it is consensual); *Pilgreen v. Brown & Williamson Fed. Credit Union (In re Pilgreen)*, 161 B.R. 552, 555 (Bankr. M.D. Ga. 1989) (debtor signed notes with provisions that allowed his employer to withhold funds to satisfy the debtor's obligations, making the resulting transfers voluntary); *Huebner v. Trapp (In re Huebner)*, 18 B.R. 193, 195 (Bankr. W.D. Wisc. 1982) (transfers made under debtor's wage assignment, although made to avoid creditor's attempts to collect, deemed voluntary).

Some transfers to which a debtor consents may, however, still be considered to be involuntary where there is fraud, material misrepresentation, or coercion, each of which tends to negate a debtor's free will. *See for example*, *In re Pfiester*, 449 B.R. 422, 424 (Bankr. D. N.M. 2011) ("The marital settlement agreement . . . was entered into by the parties in litigation. Each was represented by an attorney. There are no allegations of fraud, coercion, duress or unequal bargaining position."); *Rodriguez v. Bonds (In re Rodriguez)*, 361 B.R. 887, 893 (Bankr. D. Ariz. 2007) (noting that an "involuntary transfer may occur under circumstances involving fraud, material misrepresentation or coercion"); *In re Corwin,* 135 B.R. 922, 924 (Bankr. S.D. Fla. 1992) (noting that there was no evidence of conduct or influence by the creditor, such as harassment, insults or shame which overcame the debtor's free will in making the transfer); *Reaves v. Sunset Branch, Nat'l Bank of South Dakota (In re Reaves)*, 8 B.R. 177, 181-82 (Bankr.

9

D. S.D. 1981) (finding a transfer to be involuntary because the creditor pressured the debtor into signing the mortgage and concealed material facts). Interpreting the term "voluntary" to exclude such circumstances is consistent with the dictionary definition of the term "voluntary," which refers to acts "done by design or intention" and "unconstrained by interference; not impelled by outside influence[.]" BLACK'S LAW DICTIONARY 1605-6 (8th ed. 2004).

Additionally, there is case authority stating that a transfer is involuntary where the debtor lacks essential facts that are within the creditor's knowledge, the creditor does not make the debtor aware of those facts, and the debtor would not have made the transfer had he been aware. *Seidel v. First Nat'l Bank of Palmerton (In re Seidel)*, 27 B.R. 347, 352 (Bankr. E.D. Pa. 1983).

Putting these concepts together, a transfer is involuntary within the meaning of § 522(g)(1) if it occurred (1) by operation of law without consent; or, (2) if the debtor consented, but the consent was the product of fraud, material misrepresentation, coercion, duress or similar circumstances.

Starting with the first part of the test, the question is whether the transfer is involuntary because it occurred by operation of law without consent. The transfer did not take place by operation of law without consent; it took place because the debtor signed documents allowing the transfer. The facts do not, therefore, bring this case within the first part of the test.

The second part of the test is whether the transfer is involuntary because, although the debtor consented, that consent was obtained by fraud, material misrepresentation, coercion, duress or a similar factual circumstance. The debtor admitted in his testimony that no one tricked, intimidated, shamed or threatened him into signing the papers. He argues, though, that similar circumstances existed that made the transfer involuntary. To support this, he points to

10

the testimony that if he had not signed, he would not have gotten his disability benefits from Ford and he would likely have been fired for being absent without permission.  He also focuses on the fact that he was required to join the union to get and keep his employment at Ford.  And that this is a case where the union agreed to these procedures, rather than a situation where he personally agreed.

These facts are insufficient to bring the case within a category similar to fraud, misrepresentation, coercion, or duress.  The cases in which court have found transfers to be involuntary as a result of fraud, misrepresentation, coercion or duress describe extraordinary circumstances.  *See, for example, Davis v. Suderov (In re Davis)*, 148 B.R. 165, 174 (Bankr. E.D. N.Y. 1992) (noting that "the misrepresentations . . . can hardly be termed 'innocent' and they were accompanied by 'extraordinary sales pressure'"); *Taylor v. Indus. Valley Bank (In re Taylor)*, 8 B.R. 578, 581(Bankr. E.D. Pa. 1981) (citing harassing phone calls at home and work and threats made over an extended period); *In re Reaves*, 8 B.R. at 181 (citing "tremendous pressure" over more than three months and stating that the defendant "had applied such pressure as to break the Debtor's spirit and convince her to sign").

There are no such extraordinary circumstances here.  The communications between Ford and the debtor were all necessary to explain the debtor's options and to solicit his agreement.  Ford did not exert any pressure on the debtor to sign, and the debtor had access to knowledgeable counsel.  Everything that Ford told the debtor was true.

The debtor knew when he accepted employment at Ford that the terms of his employment would be subject to a CBA.  Every action requested of him by Ford was part of the heavily negotiated 2007 contract between Ford and the UAW.  Every consequence of the debtor's acts or

11

13-11201-pmc    Doc 93    FILED 03/24/14    ENTERED 03/24/14 15:02:08    Page 11 of 12

the testimony that if he had not signed, he would not have gotten his disability benefits from Ford and he would likely have been fired for being absent without permission.  He also focuses on the fact that he was required to join the union to get and keep his employment at Ford.  And that this is a case where the union agreed to these procedures, rather than a situation where he personally agreed.

These facts are insufficient to bring the case within a category similar to fraud, misrepresentation, coercion, or duress.  The cases in which court have found transfers to be involuntary as a result of fraud, misrepresentation, coercion or duress describe extraordinary circumstances.  *See, for example, Davis v. Suderov (In re Davis)*, 148 B.R. 165, 174 (Bankr. E.D. N.Y. 1992) (noting that "the misrepresentations . . . can hardly be termed 'innocent' and they were accompanied by 'extraordinary sales pressure'"); *Taylor v. Indus. Valley Bank (In re Taylor)*, 8 B.R. 578, 581(Bankr. E.D. Pa. 1981) (citing harassing phone calls at home and work and threats made over an extended period); *In re Reaves*, 8 B.R. at 181 (citing "tremendous pressure" over more than three months and stating that the defendant "had applied such pressure as to break the Debtor's spirit and convince her to sign").

There are no such extraordinary circumstances here.  The communications between Ford and the debtor were all necessary to explain the debtor's options and to solicit his agreement.  Ford did not exert any pressure on the debtor to sign, and the debtor had access to knowledgeable counsel.  Everything that Ford told the debtor was true.

The debtor knew when he accepted employment at Ford that the terms of his employment would be subject to a CBA.  Every action requested of him by Ford was part of the heavily negotiated 2007 contract between Ford and the UAW.  Every consequence of the debtor's acts or

failures to act was similarly negotiated by the debtor's union. The debtor complains that he had to choose between two bad courses of action: sign and have to give back any overpayment or refuse to sign and not get any benefits from Ford. This choice, however, was not one that Ford unfairly imposed upon him; it was a term negotiated by his union. There is nothing unfair, much less fraudulent or coercive, about holding the debtor to the contract negotiated by his union that required him to repay any overpayment. The debtor's consent was not, therefore, involuntary. As a result, the debtor is not entitled to exempt the money representing the amount by which Ford overpaid his disability benefits.

## **CONCLUSION**

The trustee's objection to the debtor's claim of exemption is sustained.

IT IS SO ORDERED.

／s／ Pat E. Morgenstern-Clarren
Pat E. Morgenstern-Clarren
Chief Bankruptcy Judge